IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA S. BECKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cv-294 |
| | ) | |
| THE CITY OF ST. ANN, MISSOURI, | ) | JURY TRIAL DEMANDED |
| | ) | |
| CHIEF AARON JIMENEZ, in his individual and official capacities, | ) | |
| | ) | |
| CORRECTIONS SUPERVISOR STEFAN LOGAN, in his individual and official capacities, | ) | |
| | ) | |
| SGT. GARY SCHWENK, in his individual and official capacities, | ) | |
| | ) | |
| C.O. NICHOLAS OSTOFF, in his individual and official capacities, | ) | |
| | ) | |
| C.O. DANIEL MENDIZABAL, in his individual and official capacities, | ) | |
| | ) | |
| C.O. ROBERT WHITE, in his individual and official capacities, | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| JOHN DOES AND JANE DOES, in their individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

COMES NOW Plaintiff Patricia S. Becker, individually and on behalf of the heirs at law

of Katherine Mary Pinson, deceased, and for her Complaint against Defendants states as follows:

**Parties and Jurisdiction**

1.      Plaintiff Patricia S. Becker (hereinafter "Becker") is the natural mother of Katherine Mary Pinson (hereinafter "Pinson"). She is the appropriate party to bring this action on her own behalf and the other heirs at law of Pinson pursuant to § 537.080.1 R.S.Mo.

2.      Defendant City of St. Ann, Missouri (hereinafter "City" or ""St. Ann"), is a municipal corporation organized and existing under the laws of the State of Missouri. It operates the St. Ann Jail Facility (hereinafter "Jail") through the St. Ann Police Department.

3.      Defendant St. Ann  is responsible for the death of Pinson, which was caused by the intentional acts or omissions of its employees/agents, who were acting under color of state law, and/or whose acts and/or omissions were taken as agents/employees of Defendant City in the course and scope of their employment.

4.      Defendant St. Ann also is responsible for the death of Pinson because it explicitly or implicitly adopted and/or implemented policies and procedures, customs, or practices that, among other things, allowed corrections officers and their supervisors with no or inadequate training to deny necessary medical treatment to inmates with serious medical needs, even against medical advice, to include but not be limited to Pinson. These policies, procedures, customs, and/or practices, or the failure to have same, as well as the inadequate supervision and training of the City's employees, showed a deliberate indifference to the serious medical needs of Pinson.

5.      Defendant Chief Aaron Jimenez (hereinafter "Jimenez") is and was at all times relevant herein the City's Chief of Police. Upon information and belief, as the City's Chief of Police he was the policymaker for the City of St. Ann with respect to the operation of its Jail. He is sued in both his official and individual capacities.

6. Defendant Stefan Logan is and was at all times relevant herein a supervisory corrections officer at the St. Ann Jail, who failed to provide adequate supervision or training to prevent the death of Pinson.  He is sued in both his official and individual capacities.

7. Defendant Sgt. Gary Schwenk is and was at all times relevant herein a supervisory road officer employed by the City, who failed to provide adequate supervision to prevent the death of Pinson.  He is sued in both his official and individual capacities.

8. Defendants Nicholas Ostoff (hereinafter "Ostoff"), Daniel Mendizabal (hereinafter "Mendizabal"), and Robert White (hereinafter "White") were at all times relevant herein and are correctional officers employed by the City, who were working at the time of Pinson's incarceration and could have prevented her death.  They are sued in both their official and individual capacities.

9. Defendants John Does and Jane Does are unknown employees of the City, who may have been involved in Pinson's death.  They are sued in their official and individual capacities.

10. This action is brought pursuant to the 8th and 14th Amendments of the U.S. Constitution,  and 42 U.S.C. §§ 1983 and 1988, as well as the Constitution and laws of the state of Missouri.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law pursuant to 28 U.S.C. § 1367.

11. At all times relevant herein, Defendants were acting under color of state law.

12. The acts or omissions alleged herein caused the death of Pinson while she was in the custody of the Jail, which is located in St. Louis County, Missouri, in the Eastern Division of the Eastern District of Missouri.

3

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as the district in which a substantial part of the events or omissions giving rise to the claims occurred.

14. Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## Facts Common to All Counts

15. In approximately 2000, Pinson was diagnosed with a fatty cystic tumor on her spine that required surgical removal. It could not be fully removed and Pinson was told that it would likely grow back requiring additional surgery. Pinson became addicted to opioids when after two spinal surgeries to remove this growth, doctors continued to increase her dosage for pain.

16. On August 19, 2022 Pinson was arrested by the St. Louis County Police Department.

17. After being taken into custody, Pinson was taken to SSM St. Mary's Hospital for a fit for confinement before she was transported to the St. Louis County Jail because she was complaining of chest pain, back pain, shortness of breath, and nausea. St. Mary's noted blood pressures of 151/110 and 143/111 as well as tachycardia. The hospital further noted multiple episodes of dry heaving and that Pinson reported daily heroine/fentanyl use, with her last fentanyl use at noon that day.

18. While St. Mary's Hospital certified Pinson fit for confinement, the fit for confinement stated: "The patient needs to take the following medications while being held in confinement:" amphetamine, artificial tear solution, baclofen, cyclobenzaprine, gabapentin, hydrocodone-acetaminophen, ibuprofen, meloxicam, methocarbamol, mononessa, odansetron, oxycodone, quetiapine, and tizanidine. Pinson was given a prescription for the artificial tear solution and odansetron, which upon information and belief were never filled.

4

19. Upon information and belief, Pinson was not provided any of the medications listed in paragraph 19 while held in the St. Louis County Jail from August 19 through the early morning hours of August 21, 2022.

20. During the early morning hours of August 21, 2022, Pinson was placed in the custody of the City and transported to its Jail pursuant to a failure to appear warrant for municipal/traffic violations.

21. Pinson died in the custody of the City, as set forth in more detail below, because it refused to allow her to be transported for a proper medical evaluation and treatment against medical advice due to these outstanding municipal/traffic charges.

22. The St. Ann Jail has cameras in its cells that provide for the video monitoring of its cells and inmates.

23. While Defendants claim to monitor the health and wellbeing of its inmates through these cameras, it does not actually conduct the monitoring necessary to ensure the health, safety, and wellbeing of its inmates, to include but not be limited to Pinson.

24. On August 21, 2022, Pinson was taken into the City's custody by police officer Dillon Inverson.  She complained to him of chest and back pain.  Iverson failed to note this at the time Pinson was booked.

25. During the intake at the Jail on August 21, 2022, Pinson asked to go to the hospital, still complaining of back and chest pain, telling the officers she thought she was having a heart attack. When an officer responded that Pinson already had a fit for confinement, she responded that this was 2 days ago.  When the officer said, it still said Pinson was fit for confinement, Pinson responded, "better get me checked."

26. Ultimately, paramedics from Community Fire Protection District were called.

5

Pinson's blood pressure was 162/90.

27. A St. Ann officer instructed another St. Ann officer that he needed to listen to the medics because they were the professionals as it related to Pinson, but Defendants did not listen to the paramedics.

28. When Community Fire Protection District paramedics instructed that Pinson should be transported for further medical evaluation and treatment after her arrival at the Jail, Defendants insisted upon keeping Pinson in custody against medical advice.

29. Pinson did not have and was not provided any of the medications listed in paragraph 19 required to be "fit for confinement" from the time she was taken into custody by the City through the time of her death.

30. At the time of her incarceration, Defendants knew they did not have Pinson's medications. No effort was made to obtain the medications Pinson required to be "fit for confinement" while she was held by the City.

31. Under department policy, Defendants knew that they were responsible for providing prescription medications to those in the City's custody, to include Pinson.

32. While incarcerated by the City, Pinson refused food and repeatedly vomited. Nonetheless, the Defendants still refused to transport her for proper medical care and treatment.

33. Later the same day, August 21, 2022, Officer Ostoff responded to Pinson's cell because she continued to complain of chest pains. Pinson told him she could not sit up and that she was going to throw-up.

34. Pinson was taken from her cell to the Sally Port, where she continued vomiting, and complaining of chest pain, and had difficulty sitting up.

35. Community Fire Protection District paramedics again responded to the Jail and

6

told the Defendants that while Pinson was not having a heart attack, her elevated blood pressure (136/111) was due to opioid withdrawal. Once again, St. Ann, through its officers and agents, refused to transport Pinson for proper medical care and treatment, holding her against medical advice for a second time. Defendants would not transport Pinson even after paramedics requested that a sergeant be contacted.

36. After Defendants refused to transport Pinson for proper care and treatment, Community Fire Protection District paramedics instructed them of the signs and symptoms for which to monitor Pinson.

37. Upon information and belief, these signs and symptoms were not recorded by Defendants and were not monitored while Pinson remained incarcerated at the Jail.

38. The next day, August 22, 2022, Pinson continued to complain of being ill, continued to vomit, and continued to refuse food. Pinson was not provided medical care.

39. During the late morning/early afternoon of August 22, 2022, Pinson called Becker telling her, "Mom, I'm sick and need to go to the hospital. I've got to get out of here!" While Pinson was talking to Becker, Becker heard a male voice say, "You're not going anywhere, you just need to calm down." Becker heard her daughter respond, "No! What I need to do is go to the hospital! I've got to go mom. I'll talk to you later. I'm not feeling good." Still no medical care was provided to Pinson until after she had already died.

40. Defendants knew of Pinson's need for immediate medical attention and continually disregarded her health and safety.

41. At approximately 3:10 p.m., the video monitor of Pinson's cell showed her arms and legs convulsing and then the convulsing stopped. Pinson's left leg then slowly dropped off the bed.

7

42. No medical aid was rendered to Pinson, even after the video from her cell showed that medical attention was needed.

43. According to Defendants, Pinson was last seen alive by jail staff at 3:50 p.m., which was not true.

44. On August 22, 2022, Defendants claimed to have conducted video wellness checks of Pinson at 3:30 p.m., a time at which Pinson had likely already died. They also claim to have conducted wellness checks of Pinson at 7:37, 8:41, 10:17, 10:40, and 11:16 p.m.. Pinson was not even in the cell at or after 7:37 p.m. because she had already been taken to the hospital and pronounced dead.

45. Defendants were aware that Pinson had an objectively serious medical need, which was obvious based on her complaints and condition, the paramedics' direction that she be transported for further evaluation and treatment, as well as Defendants' comments about her condition, but she was not provided medical care.

46. Despite Pinson being in medical distress at approximately 3:10 p.m., no one went to Pinson's cell until approximately 4:02 p.m., when Pinson was already dead. No medical assistance was provided for almost an hour after the video monitor showed Pinson needing medical care.

47. An autopsy performed by a St. Louis County Medical Examiner stated that Pinson died of fentanyl, methamphetamine, and gabapentin intoxication, even though the last time Pinson ingested any drug was at noon on August 19, 2022.

48. Pinson did not die of a drug overdose but because her heart failed, consistent with her complaints to Defendants before she died, when they refused to transport her from the Jail for further evaluation and treatment against medical advice.

49.     Defendants individually, and in concert with one another, intentionally, willfully, and maliciously, while acting under color of state law, showed a deliberate indifference to Pinson's serious medical needs, to include her need for transport for a proper medical evaluation and treatment, in that they had actual knowledge that while confined she needed certain medications that were not provided to her and further knew that she was having chest pains and shortness of breath, not eating and vomiting, and withdrawing from opioids, but against medical advice did not permit her transport out of the Jail for proper evaluation and treatment.

50.     Defendants individually, and in concert with one another, through policies and/or practices instituted by them and Defendant City fostered an environment which led to the deliberate indifference to Pinson's serious medical condition in violation of her civil rights.

51.     As a direct and proximate result of Defendants deliberate indifference to the serious medical needs of Pinson as described above, Becker and Pinson's other heirs at law, have sustained the following damages recoverable pursuant to § 537.090 R.S.Mo.: pecuniary loss suffered as the result of Pinson's death, funeral expenses, and the reasonable value of the services, companionship, comfort, instruction, guidance, counseling, training, and support of which Becker and Pinson's other heirs at law were deprived because of Pinson's death.

52.     As a direct and proximate result of Defendants deliberate indifference to the serious medical needs of Pinson as described above, Pinson suffered great personal injury, pain and suffering, and mental anguish prior to her death, particularly when her repeated requests for medical care were denied before she died.  Pinson was forced to suffer the deterioration of her condition, severe anxiety, distress and mental anguish, which led to physical and mental suffering prior to her death.

53.     As a direct and proximate result of Defendants deliberate indifference to the

serious medical needs of Pinson as described above, Pinson lost her life, and with it the loss of future income and the enjoyment of life.

54.	On August 22, 2022, at 4:26 p.m. the St. Ann Police Department called Becker but left no message.

55.	Becker was not notified of her daughter's death until August 25, 2022, three days after her daughter died in police custody. She was told by a St. Ann police officer that her daughter died of complications of a heart attack at St. Paul Hospital. Becker also was told the delay in notifying her was due to trying to find Pinson's next of kin, although St. Ann already had called Becker (Pinson's next of kin) on August 22 but left no message.

56.	Pinson is not the only St. Ann inmate that was not provided necessary medical care while being held at the Jail. By way of example, but not exhaustive, Tyrus K. Young testified he was not provided medical care for a gunshot wound to his leg while held in the Jail.

57.	The conduct of the individual Defendants at set forth herein was wanton, willful, and showed a deliberate indifference to Pinson's statutory and constitutional rights, justifying an award of punitive damages against them in their individual capacities so as to punish and deter them and others from engaging in similar civil rights violations in the future.

58.	Additionally, but without waiver of the foregoing, the conduct of the individual Defendants at set forth herein was willful, malicious, oppressive, and reckless to such a degree that punitive damages should be imposed as to Plaintiff's state law claim to punish and deter them and others from engaging in similar misconduct in the future.

## COUNT I
### Eighth and Fourteenth Amendment Deprivation of Medical Care
### Cognizable Under 42 U.S.C. § 1983

For Count I of Plaintiff's cause of action against Defendants Ostoff, Mendizabal, White,

Logan, Schwenk, and John/Jane Does, Plaintiff states as follows:

59. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of her Complaint.

60. From the time Pinson was taken into custody, she had objectively serious medical needs but Defendants refused to permit her transport from the Jail for proper evaluation and treatment, against the medical advice of the paramedics Defendants called to the Jail for Pinson's care.

61. Pinson's medical need was so obvious that even a layperson would easily recognize the need for medical attention. Nonetheless, she was not provided additional medical care against medical advice.

62. Pinson's serious medical need was apparent to Defendants by her statements and actions, by the medication instructions provided when she was released from St. Mary's Hospital, as well as the medical directive of the paramedics that she be transported out of the Jail for additional care.

63. Pinson's serious medical need was apparent when she told Defendants while she was on the phone with her mother on August 22, 2022, that she needed to go to the hospital. Hours before she died after telling Defendants once again that she needed to go to the hospital, Defendants once again told her she was not going anywhere, depriving her of necessary medical care.

64. Despite Pinson's obvious signs of medical distress, she was not provided proper medical care by Defendants.

65. Reasonable officers would have understood that refusing to transport Pinson for proper medical care when paramedics twice advised that she should be transported would violate

11

Pinson's constitutional rights.

66. Reasonable officers also would have understood that Pinson should be given the medications the doctor said she needed to be fit for confinement.

67. Defendants deliberately disregarded Pinson's objectively serious medical need, as well as her need for medications while incarcerated.

68. Defendants knew that Pinson required medical attention, particularly when she continued to complain about chest pain, was not eating, was vomiting, and paramedics told them twice she should be transported for further evaluation and treatment, but they insisted on holding her against medical advice and without proper monitoring simply for failing to appear for municipal/traffic violations.

69. Defendants knew there was a substantial risk that Pinson was in a critical state, particularly when paramedics advised twice that she should be transported for further medical evaluation and treatment, and she remained in custody against medical advice.

70. Defendant Logan and Schwenk knew that trained medical professionals had told subordinates that Pinson should be transported for further medical evaluation and treatment, but remained at the Jail against medical advice, and approved, condoned, failed to intervene, and/or turned a blind eye to the constitutional violation of their subordinates.

71. Defendants, acting under color of state law, showed deliberate indifference to the serious medical needs of Pinson and her substantial risk of death after having actual knowledge of her need for medical care.

72. As a direct and proximate result of the violation of Pinson's constitutional rights by the Defendants named herein, Plaintiff suffered the damages set forth above and is entitled to relief for the deprivation of her constitutional rights.

73. The conduct of the individual Defendants at set forth herein was wanton, willful, and showed a deliberate indifference to Pinson's statutory and constitutional rights, justifying an award of punitive damages against them in their individual capacities so as to punish and deter them and others from engaging in similar misconduct in the future.

WHEREFORE, Plaintiff prays this Court to enter judgment in her favor and against the individual Defendants jointly and severally, and thereafter:

> A. Award Plaintiff compensatory damages and damages for aggravating circumstances against Defendants;
>
> B. Award Plaintiff punitive damages;
>
> C. Award Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 or other applicable law; and
>
> D. Allow such other relief as this Court deems appropriate under the circumstances.

## COUNT II
### Municipal Custom/Policy and/or Failure to Implement Appropriate Policies, Practices, or Customs and Failure to Train, Supervise, and/or Discipline Cognizable Under 42 U.S.C. § 1983

For Count II of Plaintiff's cause of action against Defendants Chief Aaron Jimenez, City of St. Ann, Missouri, and/or John/Jane Does, Plaintiff states as follows:

74. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of her Complaint.

75. These Defendants knew they had a duty to provide for the safety and wellbeing of prisoners held in their Jail, to include Pinson.

76. From the time Pinson was in the City's custody, she had objectively serious medical needs, known to Defendants, but she was not provided the medical care and treatment

required for her condition, against medical advice.

77. Defendants deliberately disregarded Pinson's objectively serious medical needs by refusing to permit her transport for proper evaluation and treatment.

78. Given Pinson's condition and repeated requests for medical care, as well as the paramedics direction that Pinson be transported for further evaluation and treatment, a reasonable officer would have understood that failing to provide proper medical care violated her constitutional rights.

79. These Defendants implemented policies, procedures, customs, and/or practices related to the medical care of persons held in the City's custody that allowed untrained City employees to make medical decisions about prisoners that they were not qualified to make, even when against the medical advice of trained medical personnel.

80. Additionally, but without waiver of the following, upon information and belief, these Defendants trained their subordinates that they could make medical decisions about prisoners that they were not qualitied to make, even when against the medical advice of trained medical personnel, they were not required to get a fit for confinement when inmates complained of serious medical conditions, and/or they were not required to provide medications necessary for an inmate to be fit for confinement.

81. Additionally, but without waiver of the foregoing, according to department policy, inmates held on minor charges who were not fit for confinement could only be released by a judge, who would have no way of knowing the severity of an inmate's medical condition and was not available in the Jail to make these decisions when they needed to be made to properly provide for the medical needs of an inmate.

82. Despite a policy requiring Defendants to provide prescription medications to

14

persons in custody, by custom and practice these Defendants permitted subordinates to ignore this policy even when medical professionals stated the medications were necessary for the person to be fit for confinement.

83. Defendants' policies, procedures, customs, practices, training and/or inadequate policies/training resulted in the deprivation of Pinson's constitutional rights.

84. Defendants' custom, practice, and/or training to ignore medical distress and to refuse to permit an inmate to leave the jail for proper medical care, even when against medical advice, deprived Pinson of her constitutional rights.

85. Alternatively, but without waiver of the foregoing, Defendants' failure to have adequate policies, practices, training, or supervision to meet the medical needs of inmates resulted in the violation of Pinson's constitutional rights.

86. Defendants failed to train, supervise, and discipline staff on the rights of inmates with serious medical needs, thereby demonstrating a deliberate indifference to Pinson and other inmates.

87. The failure to train amounts to a deliberate indifference to the right of persons incarcerated in the Jail, to include Pinson.

88. Upon information and belief, correctional officers to include but not be limited to Defendants Logan, Ostoff, White, and Mendizabal, who are not medical professionals and were inadequately trained, were allowed to assess the medical needs of inmates held at the Jail against the medical advice of trained professionals, resulting in the death of Pinson.

89. Upon information and belief, Defendant Jimenez was the highest ranking official to supervise the Jail and was responsible for setting and implementing City policy with respect to the Jail.

90. From the early morning hours of August 21, 2022 until hear death the afternoon of August 22, 2022, Pinson was an inmate under the care, custody, and control of Defendants, who was in need of medical care, of which Defendants through their employees and agents knew, but did not provide appropriate medical care.

91. Defendants City and Jimenez implicitly or explicitly adopted and implemented policies, procedures, customs, or practices, that included among other things, allowing correction officers with no or inadequate training to assess the medical needs and conditions of inmates and deny medical care to those with serious medical needs, even when against medical advice, to include Pinson, which policies, procedures, customs, or practices reflected a deliberate indifference to the serious medical needs of Pinson.

92. The failure of these Defendants to implement proper policies and procedures that would provide Pinson with reasonable medical care and/or to properly train or retain jail personnel, and/or or to allow for customs and/or practices that deprived Pinson of necessary medical care amounted to deliberate indifference to Pinson's serious medical needs.

93. Upon information and belief, at the time that Pinson was incarcerated in the Jail, it was the custom and/or practice of the Defendants to inadequately train and supervise corrections officers and other personnel with supervision of the Jail on providing for the serious medical needs of inmates, thereby evidencing a deliberate indifference to Pinson's constitutional rights.

94. The need for training the City's officers/agents to deal with the serious medical needs of inmates, to include but not be limited to those withdrawing from drugs, was obvious in light of the number of inmates experiencing withdrawal and/or other serious medical conditions at the Jail.  The lack of training by Defendants was so inadequate that it was likely to result in violating the constitutional rights of inmates like Pinson.

95. Defendants' failure to train, supervise, or discipline its staff in the proper medical care/treatment to be provided to inmates' medical needs and/or to require them to follow the medical advice of trained medical professional constituted a tacit authorization of the acts complained of herein.

96. These Defendants purported investigation into the death of Pinson also demonstrates their explicit or tacit authorization of the violation of Pinson's constitutional rights.

97. These Defendants, acting under color of state law, showed deliberate indifference to the serious medical needs of Pinson and her substantial risk of death after having actual knowledge of her need for medical care through their employees/agents.

98. As a direct and proximate result of the violation of Pinson's constitutional rights by the Defendants named herein, Plaintiff suffered the damages set forth above and is entitled to relief for the deprivation of her constitutional rights.

99. The conduct of Defendant Jimenez in his individual capacity at set forth herein was wanton, willful, and showed a deliberate indifference to Pinson's statutory and constitutional rights, justifying an award of punitive damages against him in his individual capacity so as to punish and deter him and others from engaging in similar misconduct in the future.

WHEREFORE, Plaintiff prays this Court to enter judgment in her favor and against the Defendants named herein jointly and severally, and thereafter:

    A. Award Plaintiff compensatory damages and damages for aggravating circumstances against Defendants;

    B. Award Plaintiff punitive damages against Defendant Jimerson in his individual capacity;

    C. Award Plaintiff's reasonable attorney's fees and costs pursuant to 42

U.S.C. § 1988 or other applicable law; and

D. Allow such other relief as this Court deems appropriate under the circumstances.

## COUNT III
## Wrongful Death

For Count III of Plaintiff's cause of action against all Defendants except the City, Plaintiff states as follows:

100. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of her Complaint.

101. Defendants owed a duty to ensure the safety and wellbeing of inmates and detainees at the Jail, to include a duty of care to Pinson. This included the duty to provide adequate medical care and/or to transfer inmates to a facility that could provide adequate medical care when told to do so.

102. Defendants breached their duty of care to Pinson by the acts and/or omissions set forth in detail above, which are incorporated by reference herein.

103. Defendants' breach of their duty of care to Pinson was the cause in fact and proximate cause of her death.

104. Becker is entitled to recover fair and reasonable damages against Defendants as provided by § 537.080 R.S.Mo., for the wrongful injuries to and wrongful death of Pinson, including special damages for her funeral and burial.

105. From the beginning of her detention until her death, Pinson suffered physical and mental pain as a direct and proximate result of Defendants' breach of their duty of care.

106. Additionally, Becker and Pinson's other heirs at law have been deprived of Pinson's valuable companionship, comfort, love, and affection as a result of her untimely and

unnecessary death.

107. The acts/omissions of the individual Defendants were not discretionary when trained emergency medical personnel told Defendants that she should be transported for additional evaluation and treatment, and Defendants held her in the Jail against medical advice because punishing her for failing to appear for minor municipal/traffic violations was more important to them than her life/wellbeing.

108. The conduct of the individual defendants in their individual capacities as set forth herein was willful, malicious, oppressive, and reckless, justifying an award of punitive damages against them in their individual capacities so as to punish and deter them and others from engaging in similar misconduct in the future.

WHEREFORE, Plaintiff prays this Court to enter judgment in her favor and against the Defendants named herein jointly and severally, and thereafter:

    A. Award Plaintiff compensatory damages and damages for aggravating circumstances against Defendants;

    B. Award Plaintiff punitive damages against the individual defendants in their individual capacities;

    C. Award Plaintiff her costs expended herein; and

    D. Allow such other relief as this Court deems appropriate under the circumstances.

Respectfully submitted,

**PETRUSKA LAW, LLC**

By:     /s/ Lynette M. Petruska
Lynette M. Petruska, Bar No. 41212
lpetruska@att.net
1291 Andrew Dr.
Glendale, MO 63122
314-954-5031

Attorney for Plaintiff